This case is No. 08-1036 for Gadsby Incorporated v. Rapidpay, LLC. Judge, Mr. Hick. Good morning, and may it please the Court. I'd like to focus my comments this morning on the issues of anticipation and obviousness. The District Court, in our view, clearly was erroneous in finding anticipation and obviousness, and we did explain that in some of the briefs. I want to focus, for purposes of anticipation, on the issue of the Lytle & Company Firearm. That was the only program that was determined by the trial court to anticipate the claims of the patent. We think that the District Court just fundamentally misunderstood the purpose and scope of the claims in the patent. The Lytle & Company postage advance program, which was presented below, was merely a two-way relationship between a merchant processor and that processor's customers. The processor advanced money for postage, and in return, the customers would pay back that advance through a fixed repayment schedule under a particular promise allowance, simply a two-way standard lending relationship between two parties. The 2-8-1 patent does not claim there was any novelty in a processor lending money and getting paid back from its customers, nor does it claim that there's any novelty in a processor using credit card receipts to get paid back for the advances it provides to its customers. Rather, the patent claims a three-way relationship between three independent parties, the processor, the merchant, and the payment receiver, which I could refer to as a lender for purposes of discussion. And in this three-way relationship, the processor is acting as an intermediary between these two other parties. And the goal of the invention here is that the processor, by being in essence a buffer or an intermediary, can take the credit card transactions and split them, so that it's taking a portion of the amount that would otherwise go to the merchant, and it is instead providing that portion to the lender or payment receiver. The rest of it coming back to the merchant. This was the process that the patent described in detail in the specification. This is the invention that advanced and pioneered, and which essentially started a new industry, which led to a wave of copycat companies doing the same thing. Now, the LIDAR company, Priorit, doesn't have that three-way relationship. It has LIDAR and less customers. And the way the defendant tried to get around this problem was the defendant's argument, well, wait a minute, when LIDAR gets paid back by its customers, it uses a bank. And it then tried to twist the fact that a bank was involved into a three-way relationship. The record is clear that the bank that was involved here was simply acting as an agent for LIDAR. So under credit card regulations, because there was concern that processors shouldn't be directly handling the money, the regulations provided that LIDAR couldn't get it paid back from its customers unless first the money went to what was called an employer in the bank. And so what LIDAR did was basically just provide instructions to the bank as its agent, telling the bank, pay me back a certain amount of money. That doesn't change the essential nature of the program, which basically was this two-way relationship. The bank wasn't an intermediary. It wasn't a servant sitting in the middle between two other parties, the merchant and the lender, that oftentimes are at war with each other. Or, in particular, that the merchant might be at the mercy of the lender. This way of looking at LIDAR was further confirmed by the expert testimony. And I would encourage the court to review the testimony of Dr. Seamus. Dr. Seamus, and there was no dispute, he was one qualified school in New York, went extensively through the LIDAR prior art, went through the patent, described the purposes and advantages of the patent in terms of the coin language, and explained cogently why it is that it would make no sense to read the claims in a way that would encompass this two-way relationship in LIDAR. The defendants provided their own expert, but the defendants' experts did not respond to these claims. And, in fact, most of the defendants' testimony consisted of little more than their counsel asking them, do you think that claim 1 is anticipated? Answered, yes. Do you think the first element's in the prior art? Answered, that's correct. No explanation, no analysis, and no rebuttal to what Dr. Seamus had said. So when you look at the claims in the context of the prior art, the expert testimony is unrebutted that a lot of prior art simply did not anticipate. I would also point out, this is undeniably clear in particular with respect to claim 10. Claim 10 uses the term third party, three-way relationship. It specifically provides a portion of the transaction that is provided to a third party. There is no third party in the LIDAR postage advance program. LIDAR lends the money. LIDAR gets paid back. And, in fact, the court construed claim 10 specifically to exclude the merchant processor being a third party. So there's simply no way that the LIDAR postage advance program could anticipate claim 10. What does the summary of the invention mean when it says the merchant processor may be, for example, a third party entity, i.e. an entity other than the borrower or the lender? The same entity as the lender or an entity affiliated in some way. What does it mean in that? So Dr. Seamus provided testimony on that exact passage in his testimony, which was not rebutted. And he explained that that means two things depending on the claim. For purposes of claim 10, by using the term third party, what it meant was that third party could not be an entity affiliated with the lender. It's clearly somebody distinct in claim 10, making claim 10 narrower than claim 1. For purposes of claim 1, what Dr. Seamus explained was that the reason that passage was put in there, if you look at the succeeding passage, it talks about an example where that could occur, where the lender is the same entity. And the example that was given was American Express. And so the broader claim 1 was intended to encompass the idea you could have a corporate organization that was so large that the processing and the lending functions were completely distinct as a functional matter. It's still all American Express. I deal with American Express with just one big suction of money. I don't worry about which of the little branches it is that I'm dealing with. Well, from the perspective of a merchant who is trying to get funds from American Express, that would be a separate organization. That's what Dr. Seamus was explaining, that that would be a separate organization viewed separately and functionally distinct. And the point Dr. Seamus made… Why is the bank not… if a subsidiary or a division of American Express is somehow viewed as separate and distinct, why is a bank with whom LIDL has a contractual relationship governing its dealings not separate and distinct? Because the bank is acting completely at the direction and control of LIDL. It's merely acting as its own… To pick up on what Judge Clayton was saying, why isn't the unit or division or subsidiary, whatever one wants to call it, of American Express acting at the direction of American Express? I can't believe that you're going to have some part of American Express going off in some direction without guidance from above. Well, in fact, the example that was provided was assuming that there wasn't any sort of coordination between the divisions, that they operated independently without one having control of the other. It is not unusual in the financial industry to have a conglomerate of different organizations or separate incorporated divisions that operate completely independent of each other, and you deal with them separately. The point is, that Dr. Seamus was making, is that the purpose of the invention here was to have the processor act in the middle between two other functions. That was the whole point of the invention. And the reason that that was so critical was because in the prior art, you have situations in which the merchant would be at the mercy of the lender. Well, if that's the point, claim one is a little deficient, isn't it? Because nothing in claim one requires that any part of the money go back to the merchant. Actually, we believe, and we've explained in our papers, that claim one does require that, and the district court found that it did. And I can claim it. I'm having trouble finding that in the language of the claim. It is true that there's language in the written description, but I can't import the written description into the claim. In the claim, the claim says, the payment receiver receiving the portion of the payment forwarded by the merchant processor and applying that portion to the outstanding obligation, forwarding at least a portion of the payment to a computerized payment receiver as payment. That's all it does. It doesn't say what happens to the balance. Two responses to that. I'm reading it correctly. You are reading it correctly. I'm reading it correctly. There are two elements, two aspects of that I'm going to respond to. First of all, earlier in the claim, it refers to the settlement of the payment. There's a settling process. The settling process itself is describing the patent as paying the merchant. In fact, if you look through the patent, the whole point of the patent is to make sure that there's a splitting to two different parties if the settlement goes on. And Dr. Seamus in his testimony… The question is, what is the point of the claim? The claim uses the term settling for payment. And again, this is another issue in which Dr. Seamus applied at great length on what the term settling would mean to one still in the argument. And there was really no rebuttal to that testimony. But I would also argue an additional point, that even if one were to assume the term settling or the term portion didn't require that the rest be sent back to the merchant, this is a case of clear, unequivocal disavowal of claims here. When it is discussed in the written description, it is not discussed as an embodiment. It does not say in one embodiment, in one preferred embodiment, there is a splitting. It is described as a de-invention. The drawings all talk about the splitting. The description of the drawings talk about the splitting. And when you go to the paragraph in the written description, it doesn't say in one embodiment, you can split. It says, in the invention, this is what happens. The question, to make sure that I understand it, is that there is this distribution. If all the proceeds were to be forwarded to the lender by the processer, that would be in the prior art. Yes, if 100% of what would otherwise go to the merchant was sent to the lender, that would be in the prior art. If all of it went to the merchant, or if all of it went to the lender, then either of those would be in the prior art. Correct. Correct. And so the breakthrough here was that it was assumed in the prior art that the processor just had one direction to send the money. Typically, that was the merchant. And there were a couple of dining programs in which that was reversed, and the processer just sent all the money over to the lender. No one had come up with the idea, in all the years this prior art existed, of having the processor take a portion, apportioning it out to two different parties, this transaction stream, taking a percentage. We're bringing one percentage one way, and one percentage another way. And the power of this idea was so great that immediately after Advancement started doing this, you saw a wave of additional companies doing the same thing. And Advancement's success skyrocketed immediately. I'm almost done. I want to address all of this. Well, let's save your time. Let's hear from the other side. Okay. Thank you. Good morning, Janice. Janice, this has been the main thrust of the Advancement's position is that somehow LIDL is not an independent third party. And the court, of course, correctly found that LIDL was a third party. And why the court found that is because FNBL was not the agent of LIDL. FNBL is required by Visa MasterCard to perform very specific functions and has a duty to Visa MasterCard and to the merchant. And the only reason LIDL was able to give FNBL any information or so-called instructions was because the member agreement expressly, in a member agreement, the member expressly, the member being a merchant, expressly authorizes LIDL to do certain things. And if we look at the member agreement, that is A7058 through A7070, and it's dealt with on page 30 of the red brief. And in that member agreement, each of LIDL, First National Bank of Louisville, National Processing Company, and the merchant sign that agreement. And in that agreement, in section three, which is on page 7060, the agreement says that the merchant shall present sales records to LIDL. That means so that LIDL can acquire that information about transactions. Then it goes on to say in 3A that LIDL shall deliver those sales records to MPC. Why? So that MPC can get the authorization from the card issuer for this particular transaction and feed that information back to LIDL. LIDL tells the merchant it's okay to go ahead with the transaction. And then FNBL, in the member agreement, agrees to purchase all the sales records of the merchant. And that is required so that the bank acquires those sales records, does all the settling, etc., and then ultimately pays back the merchant the balance remaining. And then the agreement goes on to say, specifically, daily, LIDL shall calculate the gross proceeds, the processing fees, the pass-through fees, and the net proceeds. And LIDL shall promptly provide those to MPC. And then what is very critical is the agreement says in clause 3E on page 7060, FNBL, that's the First National Bank of Louisville, shall be entitled to rely upon such calculations and shall have no obligation to verify the completeness or accuracy thereof. That language would never appear if FNBL was simply LIDL's agent. So that language is very specific. FNBL can rely on that. There's no comeback. And then the agreement goes on to say that FNBL shall initiate a transfer in an amount equal to the net proceeds to members' bank account. And the merchant gives express authority for all of these obligations, showing that as the district court correctly found, each one of these entities, National Processing Company, FNBL, and LIDL, perform very specific functions pursuant to the member agreement as authorized by the merchant. Absent authorization by the merchant, FNBL would pay all the net proceeds to the merchant automatically. So these are independent entities, and together they constitute the merchant processor. And that's why the court found that LIDL, who forwards the money to the merchant under the post-advance agreement, is an independent third party under Claim 10, and of course is a payment receiver under Claim 1, which doesn't specify anything. And then what is further is there's testimony, of course, by LIDL, by Bouchard, by other witnesses in the record, that this is how it functioned, that they were independent entities who together constituted the merchant processor. And then in addition, of course, there's the postage advance agreements. There were six contemporaneous postage advance agreements. Each one is signed only by the merchant. And in that postage advance agreement, the agreement says, a member agrees, a member again being a merchant, a member agrees that daily repayments shall be deducted from daily net proceeds, and the repayments will be applied to the management fee first, and then to the outstanding principal amount. So again, the merchant authorizes this entity comprising these three components of the merchant processor how those repayments will be handled, and in fact specifically says that the person responsible for remitting the net proceeds will first of all, that's FNBL, will deduct the repayments to LIDL and then only remit the net proceeds to the merchant's bank, the balance of the net proceeds to the merchant's bank. Very clearly authorized by the member, and the only way that LIDL can get this money to apply to the management fee, which is the fee that LIDL charges for giving the postage advance, and then to apply to the outstanding principal amount is after the bank, FNBL, has transferred that money into LIDL's bank account in the Bank of Boston. Very clearly dictated by the agreement. And then only after that, does FNBL, as authorized by the merchant, forward the balance of the net proceeds to the merchant's account. And one issue that was also raised, and Mr. Aylman hasn't raised, is that there's no public use or public knowledge because nobody knew the flow of funds. Anybody who is involved in the merchant processing industry, who is involved in merchant processing, who knows how banks handle these, knows there has to be a bank that handles the money. That's required by the credit card issuer, Visa, MasterCard, etc. It's required by the regulations. And they know that because the agreements, which are public agreements, they're not confidential, they were known to all the participants in this program, all the employees of LIDL, all the employees of FNBL, all the employees of National Processing Company, all the employees of the merchants, they all knew all of this. And the agreement spells out that FNBL must first of all deduct the amounts due to LIDL from the net proceeds as calculated by LIDL and forward it to NPC and then on to FNBL, and must then forward the balance remaining after the payments to LIDL to the merchant's bank account. Anybody of ordinary skill in this art, and all the participants were members of ordinary skill in the art, they were all members of the public. That's why the court found that it was publicly known. They all knew about it. There was no obligation of confidentiality at all. And one other thing is LIDL had no control over the FNBL account. FNBL was a major bank involved in merchant processing. The record shows, as cited in our brief, that by 1993, the merchant processor comprising LIDL, NPC and FNBL was handling $40 billion of transactions annually. These postage advance transactions were a minor fraction of those. And as the evidence shows, both from the testimony of LIDL and Bouchard, as cited in our red brief, LIDL had no control whatsoever over the bank account at FNBL. FNBL was responsible for the card issue for that bank account. And of the small proportion of transactions that involved the postage advance agreement, it's based on the authorization of the merchant that LIDL was able to give the net proceeds information to FNBL and the daily repayments that happened before to LIDL. That's why the court found that LIDL was a third party as required by Claim 10, and that LIDL was, of course, a payment receiver as required by Claim 1. Now, lastly, I'd like to address this trust of intermediary. And if I have time, I'll come to Judge Clay's comment that there's nothing in the claims that requires that anything be sent to the merchant. The claim language is very clear. The claim language says in Claim 1 that an amount is sent by the merchant, at least a portion is sent to the payment receiver. At least a portion includes up to 100%. That's what the simple language means, and there's nothing to contradict that. But shouldn't we assume from reading the description, and then reading the claim, that even though the claim, perhaps, was a little bit artfully drawn with respect to that one issue, shouldn't we assume that a portion of it really is suggesting that the balance is going somewhere? It's not going to just disappear in space, and it's probably not going to be held by the bank. They've got the claim to it. Isn't it appropriate to read into that claim without importing the business description? Read into that claim, still understanding that probably it was back to the merchant. Claim 1 says at least a portion. Claim 10, which is the other independent claim, the system claim, says a portion. So the patent team made a deliberate distinction between those two, and there's no dispute that at least a portion can include up to 100%. And what is not being briefed, but what is certainly in the record, is the prosecution history where there was a specific provision in both Claim 1 and 10 saying that after the processing fees have been deducted, after the payment has been forwarded to the predator, the remaining portion is forwarded to the merchant. And that was taken out during prosecution. Now, as I said, it's not being briefed, but it is in the record, and I can find it. It's 85492-93. So I think that deals with that issue. And in any event, Lionel, of course, was a third party in the Lionel system. A portion was forwarded to Lionel in repayment of the postage bonds. The balance was forwarded to the merchant. In the reserve account system, a portion was forwarded to the reserve account to fund the reserve account, and the balance was forwarded to the merchant. In the clever ideas system, Dinoscope sent the entire Mount Risky discount to a member, to Clever Ideas. Clever Ideas then applied that to reduce the outstanding amount and sent the tax and tip back to the merchant. Transmedia did the same thing. So this was standard equipment. The patent makes it very clear. The judge's opinion makes it very clear that they were standard equipment that was used simply. You just enter a different account number in the computer system, and it goes there, routine. I have one other question for you. And that is, was a Section 101 issue ever raised in this case? Section 101 related to enablement? No, whether this was a patentable issue. No, it was never raised. It does have system claims, using merchant processing, using standard equipment to send information to the processor, the processor using modems to receive equipment, the processor having a computer system, you know, so claim 10 at least would have passed that bill by here. And then coming to this so-called trusted intermediary, and as you are the focus, I'm going to have more for you to eat. That's the passage from the specification, where the specification clearly says, and this is in Column 1, the merchant processor may be, for example, a third-party entity, i.e. an entity other than the borrower or the lender, or the same entity as the lender. And that's very clear. There's no dispute about that. So the merchant processor can be the same entity as the lender. Now, advance me relies on the expert, Dr. Seamus, who says, well, in American Express, that passage refers to American Express, and there you have two related American Express companies that work together, but they're not under control of each other. If we read that passage, it says, as one example, with some credit cards, the merchant processor can be a third-party. As in another example, with some cards, such as American Express. So these are basically just examples that don't detract from the absolute statement that the merchant processor can be the same entity as the lender. And in fact, in American Express, the two branches of American Express, the one that does the lending and the one that does the processing, are affiliated companies. So that's why that says, or at least closely affiliated. So that goes on. There's still the question of the assumption of a certain portion of the proceeds by the creditor, whoever it happens to be, before any, whatever's left over, is passed on to the merchant. And I gather that the prior art still does not explicitly describe that arrangement, does that make sense? That's not correct, Your Honor, because Ludlow & Company explicitly describes, as laid out in the member agreement, that, as in the postage advance agreements, which I dealt with a little while ago, that the merchant agrees that FNBL shall forward their net proceeds after deducting postage and fees, et cetera, to the merchant. And then under the postage advance agreement, the merchant authorizes the bank to deduct the repayments to Lyle for the money advanced and for the management fee from the net proceeds and then forward the balance to the merchant. So the merchant, under the Lyle program, gets the balance of the net proceeds. That's laid out in the agreements that I dealt with. And also in the reserve account system, the merchant is obliged to maintain a reserve account in case there are chargebacks. And how the merchant processor handles this, from the card transactions, a percentage gets deducted and forwarded to the reserve account to satisfy that obligation. The balance is paid to the merchant. So in both of those systems, whether splitting is required or not, and we contend that it isn't required, that certainly is Lyle. And then, finally, on this issue of that it can be the same entity as the lender, the agreed constructions of computerized merchant processor, of computerized payment receiver, and of third party, they were agreed constructions adopted by the court, and it says computerized merchant processor, a completely equipped entity or combination of entities that acquires or processes merchant transactions. No mention that it has to be a totally separate entity or a totally unrelated entity. That was agreed construction. Computerized payment receiver, which appears in claim one, account or entity capable of receiving payments or credits electronically. No suggestion that somehow it has to be totally unrelated or totally separate or totally independent. We have time for one more question. Thank you. I'm sorry, I didn't notice I'd run out of my time. Thank you. I wanted to first comment on this point concerning the claim construction. The term third party was, in fact, agreed to. Actually, it was not agreed to by the parties. It was determined by the court. The parties disputed what third party meant. And during the claim construction, the defendants argued that third party could be the merchant processor itself, so that claim 10 says forwarding from the merchant processor to the third party could mean the merchant processor forwarding it back to itself. And the courts had known that that could be what. And agreeing it with the defense meant that claim 10, narrower than claim 9, says that the merchant processor must forward a portion to a third party which is not the merchant processor, separate from the merchant processor. And if you look at the statement that the defendants are citing, regardless of what one views the following language to mean, the term third party is distinctly used in that passage to mean not affiliated entities, not the same entity, is used distinctly to mean a separate company. That's how third party is described in the specification. And there's no prior art that was put in front of the court that did a forwarding of a portion to a third party. It just didn't exist. Now with respect to the issue raised on the Lido agreement, the defendants focus on ownership of this bank account. But what they're missing is that the focus here has to be on whether the bank was merely acting as an agent with respect to the function set forth in the claim. The function set forth in the claim is this forwarding function. That was done entirely at the direction, instructions, and control of Lido. It was just using the bank. The use of a bank to keep money was not something that the patent claim was modeled. And lastly, I want to address the issue of obviousness briefly. It is telling in our view that the evidence that was put on the trial was undisputed with respect to both the comparison of the prior art from an expert point of view as well as the secondary edition. And we would point out that ultimately the question of anticipation is a question of fact and is typically provided through expert testimony. If you look at Dr. Seamus' testimony, he describes how this would be viewed as one of skill in the art. Would the Lido program be considered anticipatory to one of skill in the art? He provided a cogent explanation of why it would not. Dr. Hedlund did not. When you get to obviousness, Dr. Seamus provided an explanation of why it wouldn't be obvious, and that was supplemented by voluminous testimony from the CEO of AdvanceWeek, from the former CEO of AdvanceWeek, talking about commercial success, talking about long-term need, and copying by others. None of this testimony was responded to, but for the most part, defendants didn't even cross-examine the witnesses on this testimony, didn't try to present their own witnesses to rebut the testimony. This case was not presented as an obviousness case. It was presented as an anticipation case. And we believe what really happened here was the court tried to sort of make over the gap in evidence by referencing KSR, but we don't think the KSR case was intended as a gap filler. You still need evidence. You still need to put in evidence and record to show motivation to combine with some of the rationale for why the invention was obvious. And with that, I've done this. Are there any more questions?